FREDONIA BROADCASTING CORPORATION, INC., Plaintiff-Appellee,

v.

RCA CORPORATION, Defendant-Appellant.

No. 75–2702.

United States Court of Appeals, Fifth Circuit.

March 8, 1978.

Rehearing and Rehearing En Banc Denied April 7, 1978.

253

James E. Coleman, Jr., Marvin S. Sloman, Earl F. Hale, Jr., Dallas, Tex., for defendant-appellant.

Joseph Jamail, John Gano, Houston, Tex., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and MAHON *, District Judge.

TJOFLAT, Circuit Judge.

This diversity case is before us for the second time. Briefly, RCA Corporation (RCA) entered into a contract with Fredonia Broadcasting Corporation (Fredonia) to sell to Fredonia UHF color television broadcasting equipment for the operation of a television station in Lufkin, Texas. This station began broadcasting on July 30, 1969, and ceased operation on March 18, 1970. Fredonia then sued RCA for fraud, for breach of the sales contract, and for breach of warranty, seeking actual and exemplary damages totalling $2,650,000. RCA counterclaimed for $506,333.80, the amount not yet paid for the equipment, plus interest and attorneys' fees. The jury, in a special verdict,[1] found in favor of Fredonia and awarded $850,000 in actual damages and $150,000 in exemplary damages. As for the counterclaim, the jury's response to the court's questions required the court to enter judgment in favor of Fredonia.

RCA appealed, claiming error in the trial court's treatment of both the liability and the damages issues involved in Fredonia's claims. RCA also asserted that the district court erred in not granting it a directed

* District Judge of the Northern District of Texas, sitting by designation.

1. Fed.R.Civ.P. 49(a). The questions propounded to the jury can be found in the appendix to the opinion in the prior appeal. *Fredonia Broadcasting Corp., Inc. v. RCA Corp.*, 481 F.2d 781, 806–11 (5th Cir. 1973).

verdict on the counterclaim. A panel of this court found reversible error in the instructions under which the district court had submitted Fredonia's claim of fraud to the jury and remanded the case for a new trial.[2] The panel also set aside Fredonia's judgment on the counterclaim.[3]

On remand, Fredonia, following pretrial conferences in which the liability issues were narrowed, proceeded to trial on its claim of fraud. The jury again found for Fredonia, awarding $1,000,000 in actual damages and $750,000 in exemplary damages. On RCA's counterclaim, the court awarded $511,182.11, the amount due for the equipment on the date of Fredonia's default in payment and the costs awarded on the first appeal. In this second appeal, RCA seeks reversal of the judgment against it on two principal grounds. The first stems from the trial judge's disposition of RCA's pretrial motion for disqualification of either Fredonia's counsel or the trial judge from further involvement in the case. The second concerns, once again, the judge's instructions to the jury on damages. With respect to the counterclaim, RCA asserts error in the court's failure to include in the judgment an amount representing the interest accumulated on the balance due on the equipment.[4]

I

The principal issue in this appeal involves the trial judge's course of action when faced with RCA's oral motion, made at a pretrial hearing on April 1, 1974, for the disqualification of either Fredonia's counsel or the judge. That motion formally brought to the trial judge's attention the appearance of impropriety created by the participation in the case of one of his former law clerks, an associate in the law firm representing Fredonia. Apparently, the judge had already known of the former law clerk's association with Fredonia's counsel because the judge had previously written to him and RCA's counsel of record about a pending pretrial matter. The former law clerk was present at the April 1 hearing. During the hearing, it was pointed out that he had been on the judge's staff during the first trial of the action. RCA suggested that the former law clerk had therefore acquired intimate knowledge of the case and of the judge's inclinations about the issues involved. RCA's counsel consequently questioned the propriety of allowing the case to go forward without the withdrawal from the case of either the trial judge or Fredonia's counsel.

On April 26, 1974, the district judge denied RCA's motion. In its order denying the motion, the court acknowledged that the former law clerk, had, as law clerk, "worked on the case when it was tried for the first time" and that he had "participated in the recent proceedings in the case,"

---

2. The panel also found that many of the issues raised by Fredonia's multiple theories of recovery had been correctly resolved against Fredonia. To paraphrase the prior panel's holding, 481 F.2d at 805–06: (1) Fredonia's breach of contract claims were precluded by the terms of the contract, which the jury found Fredonia had affirmed; (2) Fredonia's breach of warranty claim was foreclosed unless the district court found on remand that the contract terms were unconscionable; (3) Fredonia's claims of misrepresentation as to date of delivery and degree of supervision were negated by the jury's finding that Fredonia's reliance upon RCA's misrepresentations was not justified; (4) Fredonia's claim of misrepresentation as to the merchantability of the equipment stands. The prior panel determined that Fredonia could not seek damages for lost profits under Texas law. Because Fredonia's fraud claims stand independently of its precluded contract claims, the case was remanded to the district court for

determinations of the actual damages from the fraud and the availability of exemplary damages.

3. The merits of RCA's counterclaim were submitted to the jury in the form of one issue, raised by Fredonia's defense to the counterclaim. That issue was whether RCA had coerced Fredonia into executing the sales agreement and accompanying promissory notes. The panel found the evidence to be insufficient to support that defense and thus concluded that the trial court had erred in not summarily resolving the issue in favor of RCA.

4. The indebtedness due on the equipment was evidenced by several promissory notes. These notes, the validity of which are no longer in contest, expressly provide for interest from the date of default.

but was of the opinion that this was not a sufficient ground to disqualify Fredonia's counsel from further participation in the case. The order also recited that the former law clerk, according to Fredonia's counsel, would "participate no further in this case." The court thus determined that the recusal of the trial judge would serve no useful purpose.

■ In deciding not to disqualify Fredonia's counsel, the district judge considered the ethical canons and the rules promulgated by the Supreme Court and the Court of Appeals for the First Circuit.[5] Although these rules explicitly forbid a former law clerk from participating in a case which was pending before the court during his term of service, the district judge found the absence in this Circuit of a formal rule of that nature to be important. This was an erroneous assumption by the district judge. These rules are express safeguards of the integrity of the judicial process, a concern of all courts. The district judge correctly noted that the canons and rules do not require disqualification of an entire law firm when the propriety of a former law clerk's participation in a case is drawn in question. Under the facts presented in this case, however, we need not delve into the problems involved in disqualifying a party's counsel.

■ The question here centers instead on the disqualification of the trial judge.

Once it appeared that Fredonia might have an unfair advantage in the litigation because its counsel included a lawyer who had been exposed to the trial judge's innermost thoughts about the case, the trial judge had no alternative to disqualifying himself. No matter how many assurances were given by Fredonia's counsel that the former law clerk would withdraw from the case, we think it clear that the propriety of continuing the proceedings before this district judge had been irrevocably tainted, and the impartiality of the judge had been reasonably questioned.

In order fully to appreciate the role of a law clerk and to evaluate the taint of impropriety that occurred in this case, we consider it appropriate to note briefly the role of law clerks in our judicial system. Historically, the practice of employing federal judicial law clerks began in 1882 when Justice Horace Gray was appointed to the Supreme Court. Justice Oliver Wendell Holmes, who continued this practice when he succeeded Justice Gray, termed law clerks "puisne judges." Congress has provided that "district judges may appoint necessary law clerks." 28 U.S.C. § 752 (1970). The law clerk has no statutorily defined duties but rather performs a broad range of functions to assist his judge. A judicial clerkship provides the fledgling lawyer insight into the law, the judicial process, and the legal practice. The association with law clerks is also valuable to the judge; in

**5.** The Code of Professional Responsibility provides as follows:

A lawyer should avoid even the appearance of impropriety.

ABA, Code of Professional Responsibility, Canon 9.

A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

ABA, Code of Professional Responsibility, DR 9–101(B).

The rules of the Supreme Court of the United States provide as follows:

No one serving as a law clerk or secretary to a justice of this court shall practice as an attorney or counsellor in any court or before any agency of government while continuing in that position; nor shall he after separating from that position practice as an attorney or counsellor in this court until two years have elapsed since such separation; *nor shall he ever participate, by way of any form of professional consultation and assistance, in any case that was pending in this court during the period that he held such position.*

Rules of the United States Supreme Court, Rule 7 (emphasis added).

The Courts of Appeals of the First Circuit and the District of Columbia have similar rules. The appendix to RCA's brief to this court, containing correspondence from the clerks of the United States Court of Appeals for the Tenth Circuit and various federal district courts, indicates that numerous federal courts follow the practice outlined in the Supreme Court's rule although they have not promulgated a formal rule. Brief of Appellant at A. 2 through 19. Fredonia does not dispute these representations.

addition to relieving him of many clerical and administrative chores, law clerks may serve as sounding boards for ideas, often affording a different perspective, may perform research, and may aid in drafting memoranda, orders and opinions.[6]

This general knowledge and experience is an invaluable asset to the law clerk and his subsequent utilization of the knowledge is to be encouraged. *See generally* K. Llewellyn, The Common Law Tradition: Deciding Appeals, 321–23 (1960). A law clerk, by virtue of his position, is obviously privy to his judge's thoughts in a way that the parties cannot be. We are not holding that a former law clerk may never practice before the judge for whom he clerked. Such a holding would clearly be unwarranted and would cast an undue burden on the law clerk. Moreover, it would hinder the courts in securing the best qualified people to serve as law clerks. What is offensive here is that the district judge seemed to countenance the notion that the law clerk could improperly use the specific knowledge gained from working with him on this particular case. The impartiality of a trial judge is seriously open to question when the judge refuses to recuse himself after being made aware that his former law clerk is actively involved as counsel for a party in a case in which the law clerk participated during his clerkship.

In addition to the possibility that Fredonia might have an unfair advantage because of its counsel's former association with the trial judge, we are concerned with the "purity of the judicial process and its institutions." *Kinnear-Weed Corp. v. Humble Oil & Refining Co.*, 403 F.2d 437, 439–40 (5th Cir. 1968), *cert. denied*, 404 U.S. 941, 92 S.Ct. 285, 30 L.Ed.2d 255 (1971). The Supreme Court has repeatedly stated that "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954); *accord, In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927). The Code of Judicial Conduct for United States Judges, approved by the Judicial Conference of the United States, expresses concern that the judicial system be protected from the appearance of impropriety in the eyes of both the parties and the general public.

> A judge should avoid impropriety and the appearance of impropriety in all his activities.
>
> A. A judge . . . should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Code of Judicial Conduct for United States Judges, Canon 2 & 2 A. The Commentary to Canon 2 states that

> [p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety.

When, as here, a judge is confronted with a situation where the appearance of impropriety is already established, a taint on the judicial system remains as long as he presides over the case. This court, moreover, through the exercise of our supervisory powers, can prohibit any practice which threatens the judicial process and its integrity. *United States v. Columbia Broadcasting System, Inc.*, 497 F.2d 107, 109–10 (5th Cir. 1974).

Because of the nature of the judge-law clerk relationship, this trial judge invited serious questions to his impartiality when he refused to recuse himself. Congress, in amending the statutory provision for the disqualification of judges, adopted the language proposed in the American Bar Association's Canons for Judicial Conduct 3 C(1)[7] with the exception of making the

---

**6.** We note, as did RCA in its brief to this court, that the problem is exacerbated under the facts here, where the prior remand was based on trial court error in fashioning the law in this case. Although the record does not disclose which facets of the first trial were participated in by the former law clerk, one could readily infer that he had been involved in drafting the jury instructions which the prior panel found to be erroneous.

**7.** In amending 28 U.S.C. § 455, Congress also intended to codify the standards of Canon 2,

disqualification mandatory by substituting the word "shall" for the ABA's "should."[8] The statute provides, in part, "A judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (Supp.1977). We have held this statutory provision to be applicable in cases where, as here, the effective date of the statute was after the commencement of the trial but prior to the full submission of the issue on appeal. *Parrish v. Board of Commissioners of Alabama State Bar*, 524 F.2d 98, 102 (5th Cir. 1975) (en banc); *Davis v. Board of School Commissioners*, 517 F.2d 1044 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).[9]

Section 455(a) is a general safeguard of the appearance of impartiality and establishes a "reasonable factual basis—reasonable man" standard. *Parrish*, 524 F.2d at 103. We hold that a reasonable man, viewing the facts as they stood at the time of RCA's motion, would reasonably question this trial judge's impartiality and the integrity of the judicial system. The district judge could not remain in the case. Consequently, we find that we must remand this case once again, this time for a trial before a different judge.

■ We note here that nothing in the record before us would preclude the law firm representing Fredonia from continuing to serve as counsel before another district judge. Disqualification of counsel is a drastic measure and conceivably could have due process implications, especially when coun-sel has served throughout proceedings as involved and lengthy as these and the client's investment in legal representation is substantial.

## II

The record of the second trial discloses some confusion concerning the effect of the prior panel opinion. For the benefit of the parties and the court on remand, and to expedite the anticipated third trial, we shall set forth what must be determined on remand. For the sake of clarity, we will discuss the element of Fredonia's fraud claim remaining to be tried; then we will address the proper measure of damages. In many respects these matters are intertwined.

### A. The Remaining Element of the Fraud Claim.

Following the remand of this case for a new trial, Fredonia amended its complaint, thus modifying its theory of recovery. By the conclusion of the final pretrial hearing, the liability issues had been narrowed to a claim of fraud, that RCA had misrepresented the merchantability of the equipment sold to Fredonia. The nature of this claim under Texas law requires further explication.

■ The prior panel opinion held that Fredonia's claims of fraud were independent of its contract claims and that the jury's finding that RCA had misrepresented the merchantability of its equipment was

---

discussed *supra* in the text. *See Overseas Private Inv. Corp. v. Anaconda Co.*, 418 F.Supp. 107, 111 n. 6 (D.D.C.1976).

8. The Code of Judicial Conduct for United States Judges, approved by the Judicial Conference of the United States, also employs the mandatory standard for disqualification. Code of Judicial Conduct for United States Judges, Canon 3 C.

9. Even under the standards in effect at the time that the district judge refused to recuse himself, we would reach the same result. The old standard, 28 U.S.C. § 455 (1970) (prior to the 1974 amendment), left the decision whether recusal was required to the discretion of the judge. In this circuit, there was a presumption against disqualification. *See, Edwards v. United States*, 334 F.2d 360 (5th Cir. 1964), *cert. denied*, 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965) (judges have a "duty to sit"). Although few district judges were reversed under the old standard, an appellate court always has the inherent power to promote justice by holding improper a trial judge's failure to disqualify himself, *Texaco, Inc. v. Chandler*, 354 F.2d 655 (10th Cir. 1965), *cert. denied*, 383 U.S. 936, 86 S.Ct. 1066, 15 L.Ed.2d 853 (1966), and an appellate court could reverse for an abuse of discretion. *See* Note, *Disqualification of Judges and Justices in the Federal Courts*, 86 Harv.L.Rev. 736, 740 (1973).

valid. The type of fraud at issue in this case is fraud in the inducement to contract. Two categories of fraudulent inducement to contract are recognized in Texas: (1) "misrepresentation" of a past or existing fact, sometimes called "false statement" and (2) "false promise," which may be described as an intentional tort and is sometimes simply termed "fraud." *Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142–43 (Tex.1974) (adopting the Restatement of Restitution § 8, *Fraud and Misrepresentation* (1957)); *International Harvester Co. v. Kesey*, 487 S.W.2d 799, 803 (Tex. Civ.App.—El Paso 1972), *rev'd on other grounds*, 507 S.W.2d 195 (Tex.1974).

In order to recover damages for a claim of misrepresentation, it is necessary to show that a material misrepresentation was made, that the speaker made it with the intention that it should be acted upon by the plaintiff, and that the plaintiff acted in reliance upon it and thereby suffered some actual injury. *E. g., Custom Leasing, Inc.*, 516 S.W.2d at 143; *Traylor v. Gray*, 547 S.W.2d 644, 650 (Tex.Civ.App.—Corpus Christi 1977). Fredonia has already proved this claim as to the merchantability of RCA's equipment. 481 F.2d at 795–96, 806. It was not necessary, in proving its case of misrepresentation, for Fredonia to show that RCA's representatives knew that the questioned representations were false when they made them. *See Baker v. Moody*, 219 F.2d 368, 371 (5th Cir. 1955); *Griffin v. Phillips*, 542 S.W.2d 432, 434 (Tex.Civ.App.—Eastland 1976, writ ref'd n. r. e.); *Custom Leasing, Inc.*, 516 S.W.2d at 144; *Success Motivation Institute, Inc. v. Lawlis*, 503 S.W.2d 864, 870 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n. r. e.).

Exemplary, or punitive, damages cannot be recovered for simple misrepresentation or false statements; it is necessary to demonstrate the speaker's knowledge of the falsity of the representation to justify an award of such damages. *Baker*, 219 F.2d at 371; *Griffin*, 542 S.W.2d at 434; *Lawlis*, 503 S.W.2d at 870. Under Texas law, the mere failure to perform a promise is not itself any evidence of an intent not to perform. *Turner v. Briscoe*, 141 Tex. 197, 171 S.W.2d 118, 119 (1943); *Precision Motors v. Cornish*, 413 S.W.2d 752, 756 (Tex. Civ.App.—Dallas 1967, writ ref'd n. r. e.). It is this additional element that distinguishes misrepresentation from the second category of fraudulent inducement to contract, "false promise." False promise is an intentional tort, requiring proof of intent not to perform the promise at the time it was made. *McDaniel v. Pettigrew*, 536 S.W.2d 611, 616 (Tex.Civ.App.—Dallas 1976, writ ref'd n. r. e.). *Susanoil, Inc. v. Continental Oil Co.*, 519 S.W.2d 230, 236 (Tex.Civ. App.—San Antonio 1975, writ ref'd n. r. e.). Texas jurisprudence makes it clear that intent to defraud is the gist of the tort of false promise. *E. g., Collins v. McCombs*, 511 S.W.2d 745, 747 (Tex.Civ.App.—San Antonio 1974, writ ref'd n. r. e.); *Susanoil, Inc.*, 519 S.W.2d at 236. Therefore, in order to recover exemplary damages Fredonia must prove at the new trial that when RCA made the representations about the equipment, RCA knew they were false or made them "recklessly"[10] without any knowledge of their truth; that is, that at the time RCA made them, RCA had the intent not to fulfill the promise. *Custom Leasing, Inc.*, 516 S.W.2d at 142–43; *Susanoil*, 519 S.W.2d at 235.[11]

---

10. In Texas "recklessly" indicates a higher standard than negligence in this context.

Even though the Court decisions and text writers use the word "reckless" in support of an award of exemplary damages, the measure of such conduct to support such an award must involve conduct of an unconscionable nature, such as, malice, fraud, oppression, bad faith, knowledge of the falsity, intention to defraud, conscious indifference or wanton disregard of the rights of others. . . . .

*International Harvester Co. v. Kesey*, 487 S.W.2d 799, 804–05 (Tex.Civ.App.—El Paso 1972), *rev'd on other grounds*, 507 S.W.2d 195 (Tex.1974) (citations omitted).

11. The holding of the prior panel opinion is summarized in 481 F.2d at 805–06. The distinction between the two categories of fraudulent inducement to contract, that is misrepresentation and false promise with its additional element of intent, is implicit in this summary. *Compare* holding three *with* holding four, *id.* at

B. *The Proper Measure of Damages.*

 RCA correctly claims error in the trial court's instructions, in the second trial, on the measurement of damages. Because of the confusion that apparently exists on the part of both parties, we find it necessary to summarize the Texas law on damages in this type of suit. In Texas, the common law measure of damages, when the defrauded party has not sought recission of the contract, is the value given for the goods less the fair market value of the goods received. *E. g., Sobel v. Jenkins*, 477 S.W.2d 863, 868 (Tex.1972); *Morriss-Buick v. Pondrom*, 131 Tex. 98, 113 S.W.2d 889, 890 (1938); *Traylor v. Gray*, 547 S.W.2d 644, 656 (Tex.Civ.App.—Corpus Christi 1977). Our review of Texas law shows that consequential damages are also recoverable in actions for fraud in the inducement to contract. *Success Motivation Institute, Inc. v. Lawlis*, 503 S.W.2d 864, 866 (Tex.Civ.App.—Houston (1st Dist.) 1973, writ ref'd n. r. e.); *El Paso Development Co. v. Ravel*, 339 S.W.2d 360, 363–64 (Tex.Civ.App.—El Paso 1960, writ ref'd n. r. e.). *See also, International Harvester Co. v. Kesey*, 507 S.W.2d 195 (Tex.1974), *rev'g* 487 S.W.2d 799 (Tex. Civ.App.—El Paso 1972).

 On retrial Fredonia may therefore recover as consequential damages pecuniary losses that resulted directly, naturally, and proximately from the fraud. These losses must be ascertained with reasonable certainty and cannot represent fictitious, conjectural, speculative, or contingent values. As the prior panel held in its opinion, 481 F.2d at 802–04, Fredonia is not entitled to recover lost profits because "prospective profits from a new enterprise which has no history of profits are too remote and speculative to be included in compensatory damages." *Id.* at 803 (quoting *Southwest Bank & Trust Co. v. Executive Sportsman Ass'n*, 477 S.W.2d 920, 929 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.)). Fredonia's damages, if otherwise recoverable, should be limited as follows:

(1) Actual damages for the unmerchantable RCA equipment, i. e., the amount Fredonia paid, or obligated itself to pay, for the equipment less the fair market value of that equipment.

(2) Fredonia cannot recover the sums spent to purchase from a different manufacturer items to replace the RCA equipment. To allow recovery for this expenditure, in addition to the actual damages relating to the unmerchantable equipment, would doubly compensate Fredonia.

(3) The proper measure of consequential damages for the loss of the FCC permit and the CBS affiliation is the money Fredonia expended to obtain them. Allowing Fredonia to recover their "value" is actually allowing recovery for lost profits. As discussed above, such profits would be purely speculative since Fredonia was never a going concern.

(4) RCA should not be held accountable for the entire cost of the television station structure, the wiring of the station, and the engineering fees to supervise the construction of the building. However, any sums spent by Fredonia to modify the building or wiring to accept replacement equipment obtained from other manufacturers are recoverable from RCA as consequential damages.

In addition to the actual and consequential damages we have outlined above, Fredonia may recover exemplary damages if Fredonia proves that RCA acted from the outset with the intent not to fulfill its promises. See part II A, *supra*.

## III

 With regard to the judgment on RCA's counterclaim, our examination of the record convinces us that the district court erred in determining as a matter of law that RCA had waived its claim to the interest by its procedural conduct at the second trial. The counterclaim and therefore the interest were not in issue at trial, and no

---

806. The panel stated that "Fredonia, on remand, can seek exemplary damages *if* fraud is proven." *Id.* (Emphasis added). Insofar as there are any statements in the prior opinion which are inconsistent with the holding, those statements cannot stand.

reference during that proceeding to the debt due on the equipment could be deemed as a waiver by RCA of the interest stipulated in the notes. On remand, the district court must determine the merits of RCA's claim for the additional interest on the notes from the date of default.

This case is REVERSED and REMANDED for further proceedings, consistent with this opinion, on Fredonia's fraud claim. The judgment of the district court on RCA's counterclaim is VACATED and REMANDED for further proceedings on RCA's interest claim. It is further ordered that this case be assigned on remand to a different district judge for all further proceedings.