In re Elwyn Ray JONES and Twilla Jean Jones, Debtors.

Frank CASS and Michael Cass d/b/a Cass Oil Company, Plaintiffs,

v.

Elwyn Ray JONES; et al., Defendants.

Bankruptcy No. 683–00082.
Adv. No. 684–6006.

United States Bankruptcy Court,
N.D. Texas,
San Angelo Division.

June 25, 1985.

Bill C. Hunter, Scott Larson, Vineyard, Drake & Miller, Dallas, Tex., for plaintiffs.

E. Ray Jones, pro se.

Bruce W. McGee, Gandy, Michener, Swindle, Whitaker & Pratt, Fort Worth, Tex., for certain individual defendants.

Stephen L. Woolard, San Angelo, Tex., for certain corporate defendants.

Ralph Dryer, San Angelo, Tex., for certain defendant trusts.

## MEMORANDUM OPINION

MICHAEL A. McCONNELL, Bankruptcy Judge.

Plaintiffs, Frank Cass and Michael Cass, bring this civil action seeking damages from the Defendants alleging causes of action based upon common law fraud, civil conspiracy and the Texas Deceptive Trade

Practices Act.* Plaintiffs further request that any Judgment awarded herein against Ray Jones and/or Twilla Jones be declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

Trial before the Court commenced on April 25, 1985 and concluded on May 3, 1985 after four days of testimony; and the Court, having heard the evidence and having reviewed the post-trial briefs of the parties, now enters the following findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules.

## FINDINGS OF FACT

1. On or about Wednesday, January 14, 1981, Michael Cass and Ray Jones engaged in discussions regarding the acquisition of a 750 Emsco Drilling Rig (the "Emsco Rig"). In this and/or subsequent conversations, Ray Jones represented to Cass that he had located such a rig for sale in Utah from the widow of an oil man who had recently died. Ray Jones further represented that the Emsco Rig could be purchased for $1,000,000 in cash.

2. Jones was an oil operator in Sonora, Texas and Michael Cass was a young man in the oil business with his father in Dallas, Texas. Jones and Cass had developed a working relationship prior to 1981 by jointly participating in some drilling programs.

3. Cass agreed to advance Ray Jones the sum of $500,000 for the express purpose of purchasing the Emsco Rig. Jones represented that he would depart over the weekend to inspect the Emsco Rig and purchase the rig if acceptable. On January 16, 1981, Cass delivered a check for $500,000 to Ray Jones in reliance upon such representations ("the Cass money"). Jones flew to Dallas with his wife for the sole purpose of picking up the check.

4. Ray and Twilla Jones then immediately took the check of Cass to Republic Bank of Irving and placed the check for collection. During the same visit to Republic Bank of Irving, Ray and Twilla Jones opened a joint checking account being Account No. 000–853–2 at Republic Bank of Irving ("Republic Bank Account").

5. On January 19, 1981, Ray Jones advised Cass by telephone that he had inspected the Emsco Rig over the weekend and was to return to Utah and view the Emsco Rig the next day and make a determination regarding its purchase at that time. Ray Jones represented that he was speaking to Cass from Las Vegas, Nevada.

6. In a conversation with Cass on January 21, 1981, Ray Jones advised Cass that he had purchased the Emsco Rig and had received a bill of sale. During such conversation, Cass requested a copy of the bill of sale. In response to said request, Ray Jones transmitted a copy of the rig inventory via air delivery instead of the bill of sale.

7. The rig inventory transmitted by Ray Jones to Cass describing the Emsco Rig was prepared on a TREBCO, Inc., inventory sheet by Ray Jones.

8. The representations by Ray Jones to Cass regarding the Emsco Rig and his purchase thereof were totally false. The Court specifically finds that Ray Jones had no intention of purchasing the Emsco Rig upon receipt of the Cass money.

9. The false representations by Ray Jones to Cass regarding the Emsco Rig and his purchase thereof were made by Ray Jones to induce Cass to transfer $500,000 to Ray Jones. The Court specifically finds that the acts of Jones were committed "knowingly" as that term is used in Section 17.50(b)(1) of the Texas Deceptive Trade Practices Act. The Court further finds that the acts of Jones were the "producing cause" of all damages to Cass as that term is defined in Section 17.50(a) of the Texas Deceptive Trade Practices Act.

10. Upon receipt of the rig inventory, Cass again spoke with Ray Jones by telephone and requested a copy of the entire bill of sale. In response to such request, Ray Jones sent and Cass received in the

---

* Plaintiff, Frank Cass, readily conceded at trial that he had no standing to assert any of the causes of action brought herein. Accordingly, all references to "Cass" in this opinion are to Michael Cass and all relief sought by Frank Cass is denied.

mail on January 23, 1981, a copy of a bill of sale (the "Bill of Sale"). The Bill of Sale, however, was a total fraud. Ray Jones forged the signature of "Juanita Davis" (the alleged owner of the Emsco Rig) on the Bill of Sale and asked an employee of Cotton Equipment in Sonora to forge the acknowledgement of a Utah notary public.

11. Upon receipt of the copy of the Bill of Sale, Cass again spoke with Ray Jones and requested that he be sent the original of the Bill of Sale.

12. Upon being furnished with a copy of the rig inventory evidencing that the purchase of the Emsco Rig had occurred, Cass transferred sufficient funds to permit the $500,000 check previously delivered to Jones in Dallas on January 16, 1981 to clear. The $500,000 check was collected by Republic Bank of Irving on January 26, 1981.

13. Immediately upon collection of the check by Republic Bank of Irving, Ray Jones caused $470,000 of the $500,000 to be wire transferred to the trust account of Golden, Rucker & Miller ("GRM")—an accounting firm in San Angelo, Texas.

14. Bill Golden, a longtime friend of Jones and partner in the Golden, Rucker & Miller firm, had engaged in discussions regarding financial planning for Jones for several months prior to the wire transfer of the $470,000. Golden had been told by Jones that he held a sizeable number of shares of Tom Brown Drilling stock and thought the wire transfer represented the proceeds of the sale of the stock.

15. Prior to placing the $500,000 check for collection at Republic Bank, Ray Jones had obtained the GRM Trust Account number from Bill Golden as well as information regarding the wire transfer of funds in order that he (Jones) could give Republic Bank instructions regarding the wire transfer. During the week of January 19, Bill Golden received a phone call from the bank officer at Republic Bank (Mary Kuntz) inquiring as to Ray Jones' whereabouts and her need to speak with him regarding clearance of the check she had received from Ray Jones.

16. The only actual evidence concerning Golden's knowledge of the source of $470,000.00 came from Golden himself. He testified that by October, 1982, when the firm prepared Jones' 1981 tax return, that despite Jones' assurances to the contrary, he was fairly certain that the $470,000.00 had come from Cass and not the sale of Tom Brown stock. Golden also testified that prior to that time, in July, 1981 and February, 1982, he had received some knowledge of a dispute between Cass and Jones over a drilling rig but that Jones denied that the $470,000.00 was involved in the dispute. It was only in October, 1982 when Jones admitted that the $470,000.00 did not come from the sale of Tom Brown stock that Golden determined for himself that the $470,000.00 had probably come from Cass, although he still did not know the circumstances under which Jones had gotten the money. The Court specifically finds that (with the obvious exception of Ray Jones) none of the Defendants had knowledge of the fact that the $470,000 came from Michael Cass, at least until July, 1981.

17. Ray Jones used the $30,000 which was not wired to the GRM Trust Account to pay off the debt on a 1981 Cadillac owned by Jones and deposited the remaining sum of $9,590.99 into the Republic Bank Account.

18. Ray Jones thereafter used portions of the money deposited in Republic Bank Account to pay for insurance for his personal vehicles and to purchase other cars and vehicles including a 1980 Cutlass and a pick-up truck for his son, Rodney, said pick-up truck has now been traded for a Camaro.

19. Upon receipt of the wire transfer, Bill Golden prepared a letter, dated January 31, 1981, which outlined an agreement between GRM and Ray Jones relating to the handling of funds placed or caused to be placed in the GRM Trust Account for the credit of Ray Jones and/or Twilla Jones and the investment thereof (the "Investment Agreement"). The Investment

Agreement was approved and executed by Jones on January 31, 1981.

20. Although the Investment Agreement bears a date of January 31, 1981, Bill Golden began to invest the funds transferred into the GRM Trust Account by Ray Jones as early as January 27, 1981.

21. GRM and Bill Golden later prepared reports on the transactions relating to the money placed in the GRM Trust Account by Ray Jones. The first report covers the period from the date of the wire transfer through December 31, 1981. The second report covers transactions for the period January 1, 1982 through June 30, 1982.

22. On or about January 27, 1981, Bill Golden caused $250,000 of the Cass Money from the GRM Trust Account to be invested in 30-day certificates of deposit. The proceeds of such certificates of deposit were to be used to purchase 1,000 shares of North American Leasing Company ("NALC") (a corporation formed two months later by Bill Golden) at $100 per share and thirty limited partnership units in the 81–A Ltd. at $5,000 per unit. The funds from the certificate of deposit were subsequently so used.

23. On or about February 9, 1981, Bill Golden transferred $100,000 of the Cass Money from the GRM Trust Account to purchase another certificate of deposit. The funds from this certificate of deposit were subsequently transferred to NALC and reflected as a loan to NALC in the amount of $100,000.

24. Portions of the Cass Money were transferred out of the GRM Trust Account as loans to the following companies:

A. Devil's River Industries;

B. S & S Casing Crews, Inc.;

C. Best Well Services, Inc.; and

D. Cotton Equipment and Service, Inc.

## NORTH AMERICAN LEASING COMPANY AND NORTH AMERICAN BROKERAGE CORPORATION

25. North American Leasing Company was incorporated on March 23, 1981. The incorporation fee for NALC was paid from the Cass Money out of the GRM Trust Account on or about March 23, 1981. The incorporator and registered agent of NALC was Bill Golden.

26. The initial board of directors for NALC was Bill Golden, Ray Jones and Robert Chessher. The initial officers were Ray Jones, President; Robert Chessher, Vice President; Bill Golden, Vice President; Twilla Jones, Treasurer; and C. Golden, Secretary.

27. 2,000 shares of NALC were purportedly issued upon incorporation; 500 shares being issued to Bill Golden, 500 shares being issued to C. Golden and 1,000 shares being issued to the GRM Trust Account. The 1,000 shares issued to GRM Trust Account were subsequently reissued, 500 shares to Ray Jones and 500 shares to Twilla Jones. Neither Bill Golden nor Carolyn Golden paid cash or property for their stock nor did they provide services prior to incorporation in consideration for the issuance to them of stock in NALC.

28. On or about October 26, 1981, NALC issued a check to Ray Jones in the sum of $50,000; on or about November 18, 1981, NALC issued a second check to Ray Jones in the sum of $60,000. These sums were deposited by Ray Jones with San Angelo Savings Association in a personal account maintained by him in the name of Ray Jones and Toyah Gilly (Debtors' daughter). Shortly thereafter most of said funds were withdrawn from such account and used to make the down payment on the purchase of the house located at 402 2nd Street, N.E., Sonora, Texas 76950.

29. Sometime in 1981, Bill Golden established a purported limited partnership in the name of North American Leasing 1981–A Limited Partnership ("81–A Ltd."). There is no written limited partnership agreement, however, for 81–A Ltd.

30. The purpose of 81–A Ltd. was to establish an equipment leasing tax shelter limited partnership to shelter income for Ray Jones.

31. 81–A Ltd. made a loan of $125,000 to Texas International Drilling Company.

32. The purported general partner of 81–A Ltd. is shown to be NALC and the purported limited partner of 81–A Ltd. is shown to be Ray Jones.

33. NALC transferred $15,000 to 81–A Ltd. for a ten percent interest in said partnership. Some of the $150,000 of the Cass Money was subsequently transferred into 81–A Ltd. and Ray Jones was credited with a 90% interest in 81–A Ltd.

34. 81–A Ltd. was not and is not filed or registered as a limited partnership in Texas or elsewhere. No partnership documents were prepared or executed evidencing such partnership.

35. North American Brokerage Corporation ("NABC") was incorporated on March 23, 1981 on the same day NALC was incorporated. The incorporation fee for NABC was paid with Cass Money from the GRM Trust Account on or about March 23, 1981. The incorporator and registered agent of NABC was Bill Golden.

36. $10,000 of the Cass Money from the GRM Trust Account was used to capitalize NABC. On or about August 4, 1981, $10,-000 of the Cass Money was transferred out of the GRM Trust Account to purchase stock in NABC for Ray Jones and Twilla Jones.

37. Of the initial stock issued by NABC in the amount of 300 shares, 100 shares were issued to Chessher, 50 shares issued to Bill Golden, 50 shares issued to C. Golden and 100 shares issued to the GRM Trust Account. The stock issued to the GRM Trust Account was subsequently reissued, 50 shares to Ray Jones and 50 shares to Twilla Jones. Neither Bill Golden, Carolyn Golden nor Robert Chessher paid cash or property for their incorporation in consideration for the issuance to them of stock in NABC.

38. NABC purportedly formed a limited partnership called North American Database 1 Limited Partnership ("Database I Ltd.").

39. Database 1 Ltd. was and is not filed or registered as a limited partnership in Texas or elsewhere.

40. NALC purportedly formed a limited partnership which was known as North American Leasing 1982–S Limited Partnership ("82–S Ltd.").

41. 82–S Ltd. was and is not filed or registered as a limited partnership in Texas or elsewhere.

42. There are no bylaws for NALC or NABC. Both NALC and NABC failed to adhere to corporate formalities in any meaningful way. Both corporations were entirely capitalized with Cass money. Finally, both Ray Jones and Bill Golden operated the corporations without regard for their corporate structure or distinctness.

## NORTH AMERICAN SOFTWARE CORPORATION AND NORTH AMERICAN TECHNOLOGY CORPORATION

43. North American Software Corporation ("NASC") was incorporated on September 19, 1983. The registered agent of NASC is Miller. The initial directors of NASC were Ray Jones, C. Golden and Miller.

44. The stock of NASC was purportedly issued to children of certain clients of GRM; the Jones Kids' Trusts; Rucker, Trustees/SEG Trust; Miller; Patti Rucker (sister of C. Golden); and members of the Windham family (affiliated with Custom Technology purportedly the contractor engaged to develop the software programs for the various limited partnerships).

45. The total capital contribution to NASC was $1,000.

46. North American Technology Corporation ("NATC") was also incorporated on September 19, 1983. The date is significant in that it was only *one day* prior to the filing of the Jones bankruptcy proceeding—an obvious attempt to shelter the software formulation from Jones' creditors. The registered agent of NATC is Miller. The initial directors of NATC were Ray Jones, C. Golden and Miller.

47. The initial stock issued by NATC was purportedly issued to the children of certain clients of GRM; the Jones Kids'

Trusts; Rucker, Trustees/Shawna E. Golden Trust ("SEG Trust"); Miller; Patti Rucker (sister of C. Golden); and members of the Windham family (affiliated with Custom Technology, purportedly the contractor engaged to develop the software programs for the various limited partnerships).

48. Debtors, as Settlors, formed certain trusts for their four children, each bearing the date of September 1, 1982. The four trusts and their respective Trustees are: the Toyah Renee Jones Cofield Irrevocable Trust and Ralph Dreyer as Trustee thereof; the Michael Wayne Jones Irrevocable Trust and Ralph Dreyer as Trustee thereof; the Rodney Darron Jones Irrevocable Trust and Ralph Dreyer as Trustee thereof; the Tammy Dawn Jones Irrevocable Trust and Ralph Dreyer as Trustee thereof (the "Jones Kids' Trusts"). Debtors transferred all of their shares of stock in NALC and NABC into the Jones Kids' Trusts, without any consideration being given therefor.

49. At no time has F. Cass, M. Cass or Cass Oil ever purchased an interest in NALC, NABC, NAACC, NASC, NATC, Devil's River Industries, S & S Casing Crews, Inc., Best Well Services, Inc. or Cotton Equipment and Service, Inc. It is absolutely clear that Frank Cass, Michael Cass or Cass Oil have not received any interest in or benefit from the diversion of the Cass money or any investments made therewith.

50. Portions of the Cass Money were transferred from the GRM Trust Account to purchase stock in Cotton Equipment and Service, Inc. and S & S Casing Crews, Inc.

51. On or about September, 1981, Ray Jones exchanged his stock ownership in Cotton Equipment and Services, Inc. and S & S Casing Crews, Inc. for stock in Devil's River Industries, Inc.

52. The name of Devil's River Industries, Inc. was changed to North American Air Compressor Corporation ("NAACC").

53. Ray Jones sold 80% of his stock in NAACC and received $51,812.80 on or about September 21, 1982.

54. Ray Jones deposited or caused to be deposited the $51,812.80 received from the sale of 80% of the stock in NAACC into the trust account established by Ralph Dreyer for Ray Jones. The tracing of the funds out of said account is set out in Cass Exhibit "32" and Cass Exhibit "33".

55. A loan of a portion of the Cass Money from the GRM Trust Account to Co-Bob Enterprises, Inc. was repaid and deposited into the trust account established by Ralph Dreyer for Ray Jones.

56. No evidence was introduced showing tracing of any funds into NALC or NABC except Cass Money.

57. Defendants, or any of them, would be unjustly enriched if they retained any Cass Money or any asset purchased, procured or obtained with Cass Money.

58. The money for the down payment on the 2nd Street House came from NALC or NALC and 81–A, Ltd.

59. Mortgage payments on the 2nd Street House were made with funds from the trust account established by Ralph Dreyer for Ray Jones.

60. The software tax shelter limited partnership offering formulation (as exemplified in Speed Math, Ltd.) (hereinafter the "Software Formulation") was the property of NALC and/or NABC.

61. The Software Formulation was transferred for no consideration to NASC and/or NATC.

62. The general partner of Speed Math, Ltd., is NALC.

63. NALC and/or NABC derived substantial benefits from the Software Formulation and its implementation in making private placement offerings.

64. NASC was originally a part of NALC.

65. Although a majority of the stock in NATC and NASC was issued to the SEG Trust and the Jones Kids' Trusts, Ray Jones and Bill Golden exercised full and complete control over said corporations.

66. The Software Formulation was transferred to NASC and/or NATC to

avoid the reach of creditors of NALC, NABC, Ray Jones, Twilla Jones, Bill Golden and/or C. Golden.

67. NALC became insolvent as a result of the transfer of the Software Formulation to NASC and/or NATC.

68. NALC ceased to do business after the transfer of the Software Formulation to NASC and/or NATC.

69. NATC and NASC failed to adhere to corporate formalities in any meaningful way.

70. Bill Golden and/or Ray Jones operated NATC and NASC without regard for their corporate structure.

71. The transfer of NALC and NABC stock by Ray and Twilla Jones into the Jones' Kids' Trusts was intended to delay or hinder creditors.

72. The transfer of NALC and NABC stock by Ray and Twilla Jones into the Jones' Kids' Trusts was intended to defraud creditors.

73. The transfer of NALC and NABC stock by Ray and Twilla Jones into the Jones' Kids' Trusts was not made for fair consideration.

74. The transfer of NALC and NABC stock by Ray and Twilla Jones into the Jones' Kids' Trusts was made at a time when Ray and Twilla Jones did not have sufficient property in Texas to pay all existing debts.

75. There is no evidence that the $1,250 contributed to the SEG Trust in September 1984 came from the Cass money.

76. Findings of fact which contain elements of conclusions of law are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this Adversary Proceeding and the parties. This Adversary Proceeding is a "core proceeding" as defined in 28 U.S.C. § 157.

2. The actions of Ray Jones constitute actual fraud. Under Texas Law, to constitute actual fraud, it must appear that: (i) a material representation was made; (ii) it was false; (iii) when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (iv) he made it with the intention that it should be acted upon by the other party; (v) the party acted in reliance upon it; and (vi) the other party thereby suffered injury. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex. 1983); *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas,* 516 S.W.2d 138, 143 (Tex.1974). Texas Law regarding fraud is also reviewed in *Fredonia Broadcasting Corporation, Inc. v. RCA Corp.,* 569 F.2d 251, 257–258 (5th Cir.1978), wherein it also recognizes that a false promise made with the intention not to perform at the time made is equally actionable as an intentional tort.

3. The evidence clearly establishes every element of the fraud perpetrated by Ray Jones by clear and convincing evidence. Unquestionably, Ray Jones made intentional misrepresentations regarding the discovery, location and acquisition of the Emsco Rig, knowing all along they were false. Obviously, the misrepresentations were material inducements to Cass' entering into an agreement with Ray Jones, delivering the $500,000 check to Ray Jones and transferring the funds to cover such check upon presentation. If the intentional misrepresentations had not been made, Cass would never (i) have entered into such an agreement; (ii) delivered the $500,000 check to Ray Jones; or (iii) transferred the funds to clear the check.

4. Clearly, Ray Jones fraudulently induced Cass to contract based upon the intentional misrepresentations regarding the discovery, location and purchase of the Emsco Rig, which fraud was facilitated and furthered by the presentation of false documents purporting to evidence the sale. Obviously, the false documents, prepared or caused to be prepared by Ray Jones, were presented to Cass to induce Cass to transfer sufficient funds to permit the $500,000 check to be cleared.

5. As a result of the fraud, Cass has been defrauded of, and suffered the loss of $500,000. In addition, Cass has suffered consequential damages by virtue of the loss of the use of the money, which are also recoverable where fraud has been perpetuated in the manner outlined above. *Fredonia Broadcasting, supra* at 258–259. As consequential damages, Cass is entitled to recover pre-judgment interest computed using the established and applicable prejudgment interest rate from the time the money was actually delivered through date of judgment.

■ 6. Plaintiffs also seek to impose liability on the Defendants pursuant to the terms of the Texas Deceptive Trade Practices Act. Defendants, however, challenge plaintiffs' standing as "consumers" to maintain this action. In this connection, the Court finds that Cass: (1) sought to acquire goods by purchase (the Emsco rig), (2) for "use" in his business activities. Although Jones was not going to sell Cass the rig, it is not necessary that the goods sought by the plaintiff be furnished by the defendant. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535 (Tex.1981). Accordingly, the Court finds that Cass has the requisite standing to assert the causes of action plead herein.

■ 7. Furthermore, the Court finds that Jones committed the following "deceptive trade practices" as defined in Section 17.46 of the Texas Deceptive Trade Practices Act:

(1) that the drilling rig was a 750 Emsco Rig which was available for purchase for a price of $1,000,000 and further that the rig was new and needed only a few additional parts to make it a complete rig; DTPA § 17.46(b)(5) and § 17.46(b)(7) (representing that the goods have characteristics, uses or benefits which they do not have and representing that goods are of a particular style or model if they are not of such model or style);

(2) that Ray Jones would complete the purchase of the Emsco Rig in which Cass and Ray Jones would each then own a one-half interest; DTPA § 17.46(d)(12) (representing that an agreement confer or involves certain rights which it does not confer or involve); and

(3) that Ray Jones failed to advise Cass that the Emsco Rig either did not exist, could not be bought for any price represented, or that Ray Jones did not purchase the rig. The failure to disclose such information was intended to induce and did induce Cass to enter into the transaction and further, had such information been disclosed, Cass would not have entered into the transaction; DTPA § 17.46(b)(23) (failure to disclose information concerning goods known at the time of the transaction, if such failure to disclose was intended to induce the consumer into the transaction and had such information been disclosed, the consumer would not have entered into the transaction.).

■ 8. Because the Court has found that the acts of Jones were committed "knowingly" under Section 17.50(b)(1) of the DTPA, the $500,000 in actual damages sustained by Cass should be trebled.

■ 9. Exemplary damages are also sought by Plaintiffs. Exemplary damages should be awarded where the misrepresentations are shown to have been willfully made with full knowledge of their falsity. *Fredonia Broadcasting, supra* at 258. That Ray Jones knew such representations to be false or that he made them "recklessly" without any knowledge of their truth and had no intention of fulfilling or performing the same at the time made is hardly open to doubt or inquiry. The actions of Ray Jones tell the whole tale—he had personal plans for the Cass Money and they sure didn't involve the Emsco Rig. However, this Court has already awarded treble damages under the Texas Deceptive Trade Practices Act for such conduct and a plaintiff may not recover both. *Charlie Thomas Courtesy Ford v. Avalos*, 619 S.W.2d 9 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ); *Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926 (Tex.Civ.App.—Houston [14th Dist.] 1982, no writ). Accordingly,

Plaintiffs' request for punitive damages is denied.

10. As a successful Plaintiff in an action under the Texas Deceptive Trade Practices Act, Cass is also entitled to an award of "reasonable and necessary attorneys' fees". DTPA § 17.50(d). Pursuant to ¶ 3.154 of the Pre-Trial Order, the Court will determine the issue of the reasonableness of the fees sought without the necessity of a further hearing.

▪ 11. Plaintiffs seek to impose liability on all of the Defendants as civil conspirators. Texas courts have described a civil conspiracy as "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex.1964). As the definition indicates, there must be an unlawful purpose or means employed for a conspiracy to exist. *Bartelt v. Lehmann*, 207 S.W.2d 131, (Tex. Civ.App.—Austin 1948, writ ref'd).

12. The only evidence which would in any way tend to show involvement in an alleged conspiracy to defraud Cass is the fact that Bill Golden developed the tax shelter vehicles for investments by Jones, and was active in making various investment decisions for Jones.

13. Texas cases hold that a conspiracy may be proved by circumstantial evidence, but that disconnected events, any of which or all of which are just as consistent with a lawful purpose as an unlawful purpose, are insufficient to prove the existence of a conspiracy. *Hicks v. Wright*, 564 S.W.2d 785, 793 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.). Here Cass has only proven that Golden invested the $470,000.00 in various entities, including several tax shelters. There is absolutely no proof of unlawful purposes or use of unlawful means by Bill Golden or on the part of those working with him.

14. Plaintiffs' attempt to prove that Bill Golden participated in a conspiracy to defraud Cass is also insufficient in other important areas having to do with Golden's knowledge and intent.

"One without knowledge of the object and purpose of a conspiracy cannot be a co-conspirator; he cannot agree, either expressly or tacitly, to the commission of a wrong which he knows not of.... And, of course, one without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other." *Schlumberger Well Sur. Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex.1968). As indicated, Golden must have *knowingly* pursued an illegal purpose. It is imperative that Plaintiffs prove that Golden knew of the alleged acts of Jones to defraud Cass and that Golden shared Jones' intent to damage Cass. *Switzer v. Joseph*, 442 S.W.2d 845 (Tex.Civ.App.—Austin 1969, no writ). To do so Plaintiffs must do more than raise a mere suspicion of Golden's *knowledge of intent*, they must prove each element of the conspiracy by a preponderance of the evidence. *Guynn v. Corpus Christi Bank & Trust*, 589 S.W.2d 764, 771 (Tex.Civ.App.—Corpus Christi 1979, writ dism'd). Proof of the required knowledge and intent cannot be established by piling inference upon inference. *Schlumberger Well Sur. Corp., supra* at 858. That a conspiracy is, by its very nature, difficult to prove does not lessen the Plaintiffs' burden of proof; Plaintiffs' proof must rely on more than unreasonable inferences to satisfy its burden of proof.

15. As in *Schlumberger*, Plaintiffs have been able to prove that a fraud took place but cannot link the Defendants other than Ray Jones to the fraud because there is insufficient proof that the Defendants other than Ray Jones had knowledge of the object of the conspiracy and the intention to injure.

16. It is readily apparent that Golden had good reason to believe that Cass had been defrauded by Jones; and that the existence and object of the fraud could have been discovered by Golden by the exercise of the slightest degree of dil-

igence. The Court is unwilling to find, however, that the evidence will support a reasonable inference that Golden had actual knowledge of the fraud, or that Golden intended to participate in any such wrong. In the absence of such knowledge and intent, a finding that Bill Golden or any of the other Defendants was a conspirator with Jones to defraud Cass is insupportable.

17. A discharge of a Chapter 7 debtor under the general provisions of 11 U.S.C. § 727 does not discharge such debtor from a debt if the debtor obtained the money, property or services by false pretenses, a false representation or actual fraud. 11 U.S.C. § 523(a)(2)(A). "Actual fraud, by definition, consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetuating what is known to be a cheat or deception". 3 *Collier on Bankruptcy* § 523.08[5]. Plaintiffs must establish each element of non-dischargeability under Section 523 by "clear and convincing" evidence.

18. The Cass Money was obviously obtained by Ray Jones by false pretenses or representations which also constituted actual fraud. It is without dispute that the Cass Money was entrusted to Ray Jones for a single specific purpose, to purchase the Emsco Rig. As evidenced by the acts of Ray and Twilla Jones, immediate and subsequent, there was no intention to use the Cass Money for such purpose. Where a debtor is entrusted with money to be used for a specific purpose and has no apparent intention of using the money for that purpose, then a misrepresentation clearly exists upon which a debt can be properly held non-dischargeable. *Merchants National Bank & Trust Company v. Pappas*, 661 F.2d 82, 86 (7th Cir.1981).

19. That the Cass Money was obtained by actual fraud renders it unnecessary for the Court to go any further in its inquiry regarding the non-dischargeability of the debt. Plaintiffs have established by clear and convincing evidence that (i) false representations were made; (ii) Ray Jones was entrusted with money to be used for a specific purpose by reason thereof; and (iii) made such false representations with the intent to deceive M. Cass and to induce him to advance the $500,000, which he did. By reason thereof, the Court determines the debt created is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

20. Plaintiffs further seek a constructive trust over all property (i) which was acquired directly or indirectly with the Cass Money; (ii) which was acquired as a result of the use of assets into which any portion of the Cass Money was diverted or used, to the extent of Defendants' interest therein; or (iii) with which the same was commingled. The evidence in this proceeding clearly establishes that Cass was induced by fraud to advance the Cass Money to Ray Jones. A constructive trust is an appropriate remedy where a party has breached a fiduciary relationship but imposition of a constructive trust is equally justified in cases of actual fraud. *Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex.1974). The *Meadows* case contains one of the best statements of the nature, scope and function of a constructive trust in Texas.

> "Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice. (citations omitted) A transaction may, depending on the circumstances, provide the basis for a constructive trust where one party to that transaction holds funds which in equity and good conscience should be possessed by another. (citations omitted) Moreover, there is no unyielding formula to which a court of equity is bound in decreeing a constructive trust, since the equity of the transaction will shape the measure of relief granted. (citations omitted). In *Magee v. Young, supra*, this court, indicating the flexibility of the constructive trust remedy, stated, '[i]n order to satisfy the demands of justice, courts of equity will indulge in presump-

tions and even pure fiction.'" *Magee v. Young* [145 Tex. 485] 198 S.W.2d 883, 885 (1946).

"It is thus apparent, considering the braod and flexible nature of the constructive trust remedy, that this court may not only properly impose a constructive trust on the proceeds of the Goldman sale in favor of Bierschwale but also extends its applicability to Meadows as well." 516 S.W.2d at 131, 132.

21. It is unrefuted that the Cass Money was obtained by fraud and that as a result of that fraud, the creation or existence of a constructive trust in favor of Plaintiffs existed and continues to exist as to all property into which any portion of the Cass Money was diverted.

22. Inherent in the grant of equitable relief of a constructive trust is the notion that to permit a person holding title to the property to retain the property would permit that person to profit by a wrong or be unjustly enriched. *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 405 (1960). This is particularly true where the Defendant has obtained legal title to property through actual fraud, misrepresentation or concealment.

23. The case at bar resembles, in some aspects, the facts presented in *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256 (1951). In *Fitz-Gerald*, the parties had orally agreed that the defendant would purchase a mineral lease but the title would be taken in both parties names with each owning an undivided one-half interest. Defendant violated the oral agreement by taking title in his name only. The court held that the defendant's repudiation of the agreement by taking the property in his own name resulted in the imposition of a constructive trust on behalf of plaintiffs for the one-half undivided interest in the mineral lease. The trust arose to both protect the rights of the plaintiff and to prevent the unjust enrichment of the defendant.

24. In this proceeding, the wrongful acts of Defendant Jones are even more egregious. The evidence clearly establishes that Ray Jones and Cass agreed to joint-ly purchase the Emsco Rig, that Cass advanced $500,000 in reliance upon the representations of Ray Jones, and that upon its purchase each would own a one-half interest in the rig. However, Ray Jones, rather than purchasing the intended property, simply took the money and proceeded to wrongfully divert and use the funds for his personal benefit and the benefit of others. Clearly such action justifies the imposition of a constructive trust on all property into which any portion of the Cass Money can be traced or into any property which was acquired by the use of assets into which any portion of the Cass Money had been diverted.

25. Based upon the above discussion, the Court finds that the following property should be imposed with a constructive trust in favor of Cass:

(a) all outstanding *stock* in and all *assets* of NALC;

(b) all outstanding *stock* in and all *assets* of NABC;

(c) all outstanding *stock* in and all *assets* of NAACC;

(d) all outstanding ownership interest in and all assets of 81–A Ltd.;

(e) all outstanding ownership interest in and all assets of 82–S Ltd., to the extent of Defendants' interest therein;

(f) all outstanding ownership interest in and all assets of Database I Ltd., to the extent of Defendants' interest therein;

(g) all assets of Dreyer, Trustee/TRJC Trust;

(h) all assets of Dreyer, Trustee/MWJ Trust;

(i) all assets of Dreyer, Trustee/RDJ Trust;

(j) all assets of Dreyer, Trustee/TDJ Trust;

(k) all outstanding *stock* in and all *assets* of NASC, to the extent of Defendants' interest therein;

(*l*) all outstanding *stock* in and all *assets* of NATC, to the extent of Defendants' interest therein;

(m) all outstanding ownership interest in and all assets of Dental Billing, Ltd., to

the extent of Defendants' interest therein;

(n) all outstanding ownership interest in and all assets of Medical Billing, Ltd., to the extent of Defendants' interest therein;

(o) all outstanding ownership interest in and all assets of Speed Math, Ltd., to the extent of Defendants' interest therein;

(p) all outstanding ownership interest in and all assets of Speed Reading, Ltd., to the extent of Defendants' interest therein;

(q) the stock of NATC and NASC held by the SEG Trust;

(r) the stock of NATC and NASC held by the Jones' Kids' Trusts;

(s) all outstanding stock or ownership interest in and all assets of any other corporation or business entity into which property which was acquired with the Cass Money or which was acquired as a result of the use of assets into which any portion of the Cass Money was diverted or used, to the extent of Defendants' interest therein.

26. Plaintiffs also seek a constructive trust on the house at 402 2nd Street, N.E., Sonora, Texas owned by Ray and Twilla Jones. Because the property apparently is their homestead, the Court finds that the imposition of an equitable lien to secure payment of the $110,000 of the Cass money used for the down-payment is the appropriate remedy rather than a constructive trust. *McGoodwin v. McGoodwin*, 671 S.W.2d 880 (Tex.1984); *First National Bank of Big Spring v. Connor*, 320 S.W.2d 391, 394 (Tex.Civ.App.—Amarillo 1959, writ ref'd n.r.e.).

27. As has been described, Plaintiffs contend that this Court should disregard the corporate fiction of NALC and NABC. Similarly, Plaintiffs contend that this Court should disregard the separate legal entity of the two newly formed corporations, NATC and NASC, because of the near identity of ownership, the identity of directors and officers and since the purpose of the relationship between the two corporations was to protect the previous fraud

perpetrated against Cass. *Hanson Southwest Corp. v. Dal-mac Construction Company*, 554 S.W.2d 712 (Tex.Civ.App.—Dallas, 1977 writ ref'd n.r.e.). In contract cases, the Texas Supreme Court has required that creditors make a showing of fraud or injustice before a court will pierce the corporate veil. *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336 (Tex.1968); *Edwards Company, Inc. v. Monogram Industries, Inc.*, 730 F.2d 977 (5th Cir.1984) (*en banc*).

28. Despite the purported formation of the two corporations in apparent conformance with the law, Plaintiffs submit that this Court should "pierce the veil" of NALC and NABC. The clearest reason for doing so is stated in *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 351 (1955), wherein the Texas Supreme Court stated:

> "Courts will not disregard the corporation fiction and hold individual officers, directors or shareholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations."

As the evidence has consistently shown, the capitalization of the corporations NALC and NABC was the method by which a portion of the Cass Money was wrongfully diverted and concealed. While there is no single test for determining whether a court should disregard the separateness and legal distinctions of the corporate form, the formation and operation of NALC and NABC reveals that these corporations were simply conduits for continuing the wrongful diversion and use of the Cass Money by Jones.

29. Except for the Cass Money, there is no other capitalization for these corporations. The minute books of both corporations reveal that not only did both corporations fail to have organizational meetings, but in their nearly four years of purported existence, NABC has had one shareholders/directors meeting and NALC has had two. As reflected by the trial testimo-

ny of Carolyn Golden, at times she acted in one capacity when the minute book suggests she was officially installed in a different position.

30. It is stipulated that there are no bylaws for either NALC or NABC. This typifies the operation of these corporations. Decisions were routinely made by Bill Golden and Ray Jones without regard for corporate formalities. Similarly, Ray Jones and Bill Golden have not and do not distinguish between corporate and personal property. Ray Jones continues to possess a large amount of property which is, in fact, property of NALC. This is further bolstered by the trial testimony of Ray and Twilla Jones who both acknowledge receiving payments from the corporations but acknowledge performing no particular service for such payments nor otherwise earning the same.

31. In this case, "... the facts are such that an adherence to the fiction of the separate corporation existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *First National Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100, 103 (Comm. of App.1939). As such, this Court finds that the corporate fiction of NALC and NABC should be disregarded.

32. Plaintiffs contend that all indices of a sham corporation are also present in the creation and operation of NASC and NATC. Both corporations were incorporated one day before Ray Jones filed bankruptcy. Both are $1,000 corporations performing multi-thousands of dollar transactions. The officers and directors of the new corporations are identical or nearly identical as the officers and directors which were serving NALC at the time. The corporate minutes of the two corporations reflect a distinct lack of adherence to corporate formalities. As is evident from the discussions and agreement between Ray Jones and Bill Golden regarding the Jones' Kids' Trusts receiving stock in the new corporations, Ray Jones was simply receiving part interest in the corporations which would hold assets which had been planned and developed in NALC and NABC. Given the totality of the circumstances, this Court finds that the creation of the two corporations was an intentional deception to perpetuate fraud and conceal and secrete assets to prevent the reaching of such assets by creditors.

33. The stock issued to Bill Golden, Carolyn Golden and Robert Chessher in NALC and NABC and the stock in NALC transferred to the SEG Trust was not issued for lawful consideration and is therefore void and cancelled.

34. The officers, directors and/or shareholders used the corporate entity of NALC and NABC as a sham to perpetuate a fraud upon Cass. Therefore, the corporate fiction of NALC and NABC should be disregarded.

35. The officers and directors of NALC and NABC breached their fiduciary duty when they transferred the Software Formulation to NASC and/or NATC.

36. The Software Formulation constituted a corporate opportunity and trade secret of NALC.

37. The transfer of the Software Formulation from NALC and NATC and/or NASC usurped a corporate opportunity of NALC, perpetuated a fraud on the creditors and should be rescinded.

38. Where appropriate, a finding of fact shall be treated as a conclusion of law and a conclusion of law shall be treated as a finding of fact.

39. The Clerk is directed to enter this Memorandum Opinion and to furnish copies to the attorneys listed below in conformity with Rules 9022 and 7005 of the Bankruptcy Rules.

40. Plaintiffs' attorneys are instructed to prepare a Judgment in conformity with this Opinion within five (5) days from receipt of this Opinion and to submit it to the Clerk. All other parties shall then have an additional five (5) days to object to the form of the Judgment.